**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\*\*\*

UNITED STATES OF AMERICA,

           Plaintiff,

vs.

ROBERT KANE, *et al.*,

           Defendants.

2:13–cr–250–JAD–VCF

<u>**ORDER**</u>

Before the court is Defendant Steven Carr's motion to dismiss the Government's indictment for lack of jurisdiction (#60[1]). The motion is joined by co-defendants Robert Coleman (#61), Robert Kane (#62), Thomas McNamara (#64), and Eric Panter (#72). The Government filed an opposition (#74); and Carr filed a reply (#75), which is joined by Coleman (#76) and McNamara (#77).

## BACKGROUND

This matter involves the alleged extortion and beating of L.T. (hereinafter "the victim") and the prosecution of Robert Kane, William Congero, Steven Carr, Robert Coleman, Eric Panter, and Thomas McNamara under the Hobbs Act, 18 U.S.C. § 1951(a), for conspiracy to interfere with interstate commerce by extortion. (*See* Indictment (#1) at 2–3).

**I.**    <u>**The Victim Manages and Controls the Las Vegas Chapter of American Cruisers**</u>

From approximately 2007 to 2009, the victim was the president of the Las Vegas, Nevada chapter of the American Cruisers Motorcycle club. (*See* Def.'s Mot. Dismiss (#60) at 2:8–9). American

---

[1] Parenthetical citations refer to the court's docket.

1

Cruisers is "a non-territorial," "international association of motorcycle enthusiasts." AMERICAN CRUISERS MOTORCYCLE CLUB, http://americancruisers.us/ (last visited Oct. 22, 2013)[2]; (*accord* Def.'s Mot. to Dismiss (#60-1) Exhibit A at 1:2). American Cruisers currently operates in nine states. *See* AMERICAN CRUISERS MOTORCYCLE CLUB http://americancruisers.us/index.php/chapters (last visited Oct. 22, 2013). The club sponsors charitable events and engages in interstate lobbying. *See generally id.* (discussing the club's charitable activities and identifying the state representative for each chapter). As part of his duties with American Cruisers, the victim reported to American Cruisers' national president, directed American Cruisers' local activities, and managed interstate disputes between American Cruisers and the Hells Angels in Arizona. (Def.'s Mot. Dismiss (#60) Exhibit A at 2:16).

During the time in question, American Cruisers' national president was "Big John." (Def.'s Mot. Dismiss (#60) at 2:11). "Big John" is a California resident. *Id.*; *see also* AMERICAN CRUISERS MOTORCYCLE CLUB http://americancruisers.us/index.php/chapters (last visited Oct. 22, 2013) (identifying John "Big John" Manser as residing near the Mojave River near the San Bernardino Mountains). In 2009, "Big John" sponsored the victim's Las Vegas chapter of American Cruisers into the Confederation of Clubs. (*Id.* at 2:11–12).

The Confederation of Clubs is a conglomerate of motorcycle clubs and outlaw motorcycle gangs ("OMG")[3] that includes the Vagos, Mongols, and Bandidos motorcycle clubs. (*Id.* at 2:11–12). Like American Cruisers, Vagos Motorcycle Club is an international organization. OFFICIAL VAGOS MC WORLD SITE, http://vagosmcworld.com/ (last visited Oct. 22, 2013) (cited in Gov't's Opp'n (#74)

---

[2] *See infra* DISCUSSION § II (discussing the use of websites as evidence).

[3] Although many OMGs operate criminal enterprises to support their clubs, the term "outlaw" indicates that the club is not sanctioned by the American Motorcyclist Association and does not adhere to the AMA's rules and bylaws. *See* William L. Dulaney, *A Brief History of Outlaw Motorcycle Clubs*, INT'L J. OF MOTORCYCLE STUDIES (Nov. 2005), available at: http://ijms.nova.edu/November2005/IJMS_Artcl.Dulaney.html.

Exhibits 2–3). Member of the Confederation of Clubs pay the Confederation annual dues and are "obligated to show up at certain events." (Def.'s Mot. Dismiss (#60) Exhibit A at 1:3).

Around the time that American Cruisers joined the Confederation of Clubs, "Big John" decided that the Las Vegas chapter of American Cruisers had become too close with the Vagos Motor Cycle Club. (*Id*. at 2:13–15). "Big John," therefore, disbanded the Las Vegas chapter of American Cruisers. (*Id*. at 2:15); (Gov't's Opp'n (#74) at 2:4).

## II.  **The Las Vegas Chapter of American Cruisers Joins Vagos**

"Big John's" decision to disband the Las Vegas chapter of American Cruisers angered the president of the Vagos Motorcycle Club, Defendant Robert Kane. (Def.'s Mot. Dismiss (#60) at 2:15–17). As a result, a dispute between Vagos and American Cruisers arose in which Vagos attempted to acquire or merge with the Las Vegas chapter of American Cruisers.

During a meeting of the Confederation of Clubs, Kane announced that "no more American Cruisers would be allowed in Nevada." (*Id*. at 2:18–19). Kane, then, sent Vagos members to Barstow, California to inform "Big John" that Kane planned to prevent the Las Vegas chapter of American Cruisers from being disbanded. (*See id*. Exhibit A at 2:7). Kane subsequently invited the victim's chapter to merge with (*i.e.*, "patch over" to[4]) the Vagos club. (*Id*. at 2:19–20) (stating that Kane proposed that the victim start a "puppet" American Cruisers club aligned with the Vagos club); (Gov't's Opp'n (#74) at 2:8).

The victim, however, declined Kane's offer because Kane's terms required the American Cruisers to pay Vagos motorcycle club dues upfront, which neither the victim nor his club members could afford. (Def.'s Mot. Dismiss (#60) at 2:20–22). Accordingly, Kane decided to "patch over" the victim and his chapter vice president, Defendant Eric Panter, from American Cruisers to Vagos. (*Id*. at

---

[4] Motorcycle patches are the primary means of displaying membership in and/or allegiance to a motorcycle club. *See, e.g.*, Dulaney, *A Brief History of Outlaw Motorcycle Clubs*, INT'L J. OF MOTORCYCLE STUDIES (Nov. 2005).

3

2:23–24). Under the terms of this agreement, the victim and Panter would become probationary members of the Vagos club for a two-year period (*Id*.)

On April 4, 2009, the victim and Panter rode from Las Vegas to Hesperia, California to pick up Vagos Motorcycle Club patches at the home of Vagos's international president, Terry Orendorff. (Def.'s Mot. Dismiss (#60) at 2:23–25); (Gov't Opp'n (#74) at 2:10–12). Once in Hesperia, the victim was reminded of the terms of his agreement, given an application form, and received a Vagos patch. (Def.'s Mot. Dismiss (#60) at 3:1–2). Normally, Vagos patches cost new members $750.00. (*Id*.) Because the victim could not afford the patch, Kane fronted the money. (*Id*.)

After the victim was "patched over" to Vagos, the Las Vegas chapter of American Cruisers remained within the victim's apparent management and control. The victim continued to hold "church,"[5] direct American-Cruisers club business from "Jeweler Joe" Harrison's tattoo parlor, and manage disputes between American Cruisers and the Hells Angels in Arizona. (*See id*., Exhibit A at 2:16). In reality, however, the Las Vegas chapter of American Cruisers was controlled by Kane. During the victim's trip back to Las Vegas from Hesperia, the victim was escorted by Enrique Felix, the vice president of Vagos's Las Vegas chapter. (*Id*., Exhibit A at 2:15). Felix took the victim through the Glamis, California sand dunes and told the victim "that there [are] two bodies out there in the sand that did not work out for the [Vagos] club." (*Id*., Exhibit A at 2:15).

On April 18, 2009, the victim was arrested for carrying a concealed weapon without a permit. (*Id*. at 3:3–4). The next day, Vagos members posted the victim's $750.00 bail. (*Id*.) Shortly thereafter, the victim was contacted by Vagos members to participate in a mortgage fraud scheme. (*Id*. at 3:7–8). When the victim declined to participate in the scheme, Defendant William Congero allegedly told the

---

[5] "Church" is a term that many motorcycle clubs use to describe their meetings at which they discuss club business. (Def.'s Mot. Dismiss (#60) Exhibit A at 2:16).

4

victim that he would be taxed $550.00 a month. (*Id.* at 3:9). Congero also allegedly threatened to "pay [the victim's] wife a visit" if the victim did not pay the taxes. (*Id.* at 3:10).

### III.    The Victim is Allegedly Beaten for Insubordination

On Wednesday, June 17, 2009, Congero told the victim to go to Black Knight's clubhouse. (*Id.* at 3:14). The "black clubs" were apparently behind in their club dues and "needed to be taxed." (*Id.* at 3:12–13). The victim arrived at the Black Knight's clubhouse, met Congero, and was escorted out the backdoor. (*Id.*) Kane, Defendant Thomas McNamera, Defendant Robert Coleman, and Defendant Steven Carr were waiting outside. (*Id.* at 3:15). The victim was allegedly beaten. (*Id.* at 3:16–17). Congero, Carr, and Coleman allegedly demanded the title to the victim's car, his handgun, cash, and instructed the victim that he needed to pay $5,000.00 by Friday, June 19, 2009. (*Id.* at 17–18). When the beating stopped, Congero, Coleman, and Carr allegedly left with the victim's Harley-Davidson. (*Id.* at 19).

Later that day, a Las Vegas Metropolitan Police officer discovered the victim covered in blood and walking near the intersection of Rancho and Oakey. (*Id.* at 3:24–27). The victim stated that he did not report that his motorcycle was stolen because he was afraid of the Vagos club. (*Id.*)

Sometime later, Harley-Davidson Financial sued the victim because, after months of making delinquent payments, he had stopped making any loan payments. (Gov't Opp'n (#74) at 3:17–18, Exhibit 5).

### IV.    Defendants are Indicted under the Hobbs Act

On June 25, 2009, Kane, Congero, Carr, Coleman, Panter, and McNamara were indicted under the Hobbs Act for conspiracy to interfere with interstate commerce by extortion. (*See* Indictment (#1) at 2–3). In its entirety, the indictment states:

> Beginning on or about June 17, 2009, and continuing through a date unknown, in the State and Federal District of Nevada, Robert "BK" Kane, William "East Coast Billy" Congero, Steven "Big Steve" Carr, Robert "Mayhem" Coleman, Eric Panter, and Thomas "Tommy Mac" McNamara, defendants herein, did agree and conspire together and with

others known and unknown to unlawfully obstruct, delay or affect commerce, as that term is defined in Title 18, United States Code, Section 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in Title 18, United States Code, Section 1951, in that the defendants did attempt to obtain property consisting of $5,000.00 in U.S. Currency belonging to the victim, an individual identified as L.T., a former member of the Vagos Motorcycle Club, with his consent, by means of actual and threatened force, physical violence, and fear of injury, to wit: the defendants physically attacked or assisted in the physical attack of L.T., the theft of his Harley Davidson motorcycle and personal effects, and the attempted burglary of his home; all in violation of Title 18, United States Code, Section 1951(a).

(*Id.*)

On August 23, 2013, Carr filed the instant motion to dismiss (#60). Carr contends that the Government's indictment fails to invoke federal jurisdiction because the underlying crime involved the intrastate robbery of the victim's Harley-Davidson, which had no direct or indirect effect on interstate commerce. (Def.'s Mot. Dismiss (#60) at 4–8). In response, the Government asserts that the victim's robbery invokes federal jurisdiction because: (1) the robbery was predicated on club activities and the payment of motorcycle club dues, which customarily cross state lines; and, (2) the loss of the victim's motorcycle depleted Harley-Davidson, Inc.'s assets in Chicago, Illinois. (*See generally* Gov't's Opp'n (#74) at 4–12).

## LEGAL STANDARD

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Given federalism's central role in the Constitution, the Supreme Court has long directed lower courts to presume that they lack jurisdiction. *Turner v. Bank of North Am.*, 4 U.S. 8, 11, 4 Dall. 8, 11 (1799); *see also U.S. v. Pappadopoulos*, 64 F.3d 522, 528 (9th Cir. 1995), *rev'd on other grounds by Jones v. United States*, 529 U.S. 848 (2000) ("[Federal courts] must jealously preserve the balance of power between the federal and state governments"). In the criminal context, the burden of demonstrating federal jurisdiction rests on the Government. *See Kokkonen*, 511 U.S. at 377 (stating that

the burden of establishing that a cause lies within the limited jurisdiction of the federal courts is on the party asserting jurisdiction).

If a criminal defendant believes the Government's indictment "fails to invoke the court's jurisdiction," Federal Rule of Criminal Procedure 12(b) permits the defendant to contest jurisdiction in a pretrial motion to dismiss. *See* FED. R. CRIM. P. 12(b)(2), (b)(3)(B). When examining a motion to dismiss under Rule 12, the court must take the indictment's allegations as true. WRIGHT & LEIPOLD, FEDERAL PRACTICE & PROCEDURE: CRIMINAL 4TH § 194 (citing, *inter alia*, *U.S. v. Sampson*, 371 U.S. 75, 78–79 (1962)). The court may make preliminary findings of fact necessary to decide questions of law. *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986). The court may not, however, invade the province of the jury and decide by pretrial motion matters "of the general issue." *Id.*; FED. R. CRIM. P. 12(b)(2) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue"). When deciding a pretrial motion brought under Rule 12, the court's role is merely to determine whether the indictment is facially valid, and not whether either party is entitled to judgment on the pleadings. *See, e.g.*, *United States v. Titterington*, 374 F.3d 453, 457 (6th Cir.2004) ("[A] pretrial motion alleging a 'defect in the indictment' under [Rule] 12(b)(3)(B), represents the modern equivalent of a 'demurrer' because both pleadings serve to attack the facial validity of the indictment"); *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (citation omitted) ("A motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence").

**DISCUSSION**

The sole issue raised by Carr's motion is whether the Government's indictment invokes federal jurisdiction under the Hobbs Act, 18 U.S.C. § 1951(a), as determined by the Commerce Clause, U.S.

CONST. art. I, § 8, cl. 3. (Def.'s Mot. to Dismiss (#60) at 4–8); (*accord* Def.'s Joinder (#64) at 2–3). Accordingly, the court will begin by reviewing the Hobbs Act's jurisdictional reach before examining the merits of Carr's motion.

## I.    Federal Jurisdiction under the Hobbs Act, 18 U.S.C. § 1951(a)

The Hobbs Act provides for federal jurisdiction over crimes that were traditionally state-law matters. *See United States v. Culbert*, 435 U.S. 371, 379 (1978) ("[T]here is no question that Congress intended to define as a federal crime conduct that it knew was punishable under state law"). In pertinent part, the Act states:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The Hobbs Act was conceived as part of a legislative scheme to deter "professional gangsterism" and free interstate commerce from the destructive burdens of organized extortion and robbery. *See* S. REP. NO. 73–1440, 73d Congress, 2d Session (quoted in *Carbo v. United States*, 314 F.2d 718, 732 n. 10 (9th Cir. 1963)). Congress, therefore, drafted the Act to extend as far as the Constitution's Commerce Clause permits. *U.S. v. Pascucci*, 943 F.2d 1032, 1035 (9th Cir. 1991). Consequently, the court's jurisdictional inquiry under the Hobbs Act requires the court to decide whether the Commerce Clause permits the Government to exercise jurisdiction over Carr and his cohorts.

To establish the interstate commerce element of a Hobbs Act violation, the Government only needs to establish that a defendant's alleged crime had a *de minimis* effect on interstate commerce.[6]

---

[6] Contrary to Defendant McNamara's assertion (*see* Def.'s Joinder (#64) at 2), the Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549 (1995), which struck down the Gun–Free School Zones Act of 1990 that

*United States v. Lynch*, 437 F.3d 902, 909 (9th Cir. 2006); *Atcheson*, 94 F.3d at 1241. Any effect on interstate commerce, whether direct or indirect, invokes federal jurisdiction. *Wickard v. Filburn*, 317 U.S. 111, 210 (1942); *see also United States v. Kuta*, 518 F.2d 947 (7th Cir. 1975), cert. denied 423 U.S. 1014 (1975) (stating that even a beneficial effect on interstate commerce, *e.g.* facilitating the flow of building materials across state lines, invokes federal jurisdiction). The interstate nexus requirement may be satisfied "by proof of a probable or potential impact" on interstate commerce. *United States v. Huynh*, 60 F.3d 1386, 1389 (9th Cir. 1995). That is, the Government is not required to show, as McNamara contends, that a defendant's crime actually affected interstate commerce. (*See* Def.'s Joinder (#64) at 2) ("Rumors or reports of [Defendants'] alleged criminal actions did not raise the price of soy beans or cause the Dow Jones average to rise or fall one-one hundredth of a point").

The Ninth Circuit has consistently upheld convictions under the Hobbs Act where the effect on interstate commerce was "slight." *See, e.g.*, *United States v. Pascucci*, 943 F.2d 1032, 1035 (9th Cir. 1991) (defendant threatened to deliver embarrassing audio tapes to his victim's employer, a corporation engaged in interstate commerce); *United States v. Hanigan*, 681 F.2d 1127, 1130–31 (9th Cir. 1982) (defendant robbed three undocumented alien farm workers, affecting the movement of labor across borders); *United States v. Phillips*, 577 F.2d 495, 501 (9th Cir. 1978) (defendant's extortion 'threatened the depletion of resources from a business engaged in interstate commerce').

Like the Commerce Clause, however, the Hobbs Act's jurisdictional reach is limited. One such limit involves the distinction between the robbery of a business and the robbery of an individual in defining what constitutes *de minimis* effect on interstate commerce. To date, at least at eight Circuit Courts have held that the Hobbs Act does not automatically apply to the robbery of an individual.

---

outlawed the possession of guns in local school zones, did not change in the *de minimis* standard under the Hobbs Act. *United States v. Atcheson*, 94 F.3d 1237, 1242 (9th Cir. 1996).

*See United States v. Perrotta*, 313 F.3d 33, 36 (2nd Cir. 2002); *United States v. Lynch*, 282 F.3d 1049, 1053 (9th Cir. 2002) (*Lynch I*); *United States v. Diaz*, 248 F.3d 1065, 1084–85 (11th Cir. 2001); *United States v. Wang*, 222 F.3d 234, 238–40 (6th Cir. 2000); *United States v. Quigley*, 53 F.3d 909, 910–11 (8th Cir. 1995); *United States v. Collins*, 40 F.3d 95, 99–101 (5th Cir. 1994); *United States v. Buffey*, 899 F.2d 1402, 1404–06 (4th Cir. 1990); *United States v. Mattson*, 671 F.2d 1020, 1023–25 (7th Cir. 1982).

This distinction is predicated on federalism's central role in the Constitution, and the Circuit Courts' concomitant refusal to convert every robbery or extortion into a federal offense. *See, e.g.*, *Lynch*, 282 F.3d at 1053 (citing *Lopez*, 514 U.S. at 552); *see also United States v. Ballinger*, 312 F.3d 1264, 1271 (11th Cir. 2002) ("To allow Congress to regulate local crime on a theory of its aggregate effect on the national economy would give Congress a free hand to regulate any activity, since, in the modern world, virtually all crimes have at least some attenuated impact on the national economy").

When an individual is allegedly robbed, and the robbery is alleged to have had an indirect effect on interstate commerce, Ninth-Circuit law (*i.e.*, the *Lynch* test) requires a heightened jurisdictional showing. *Lynch*, 282 F.3d at 1053 (*Lynch I*) (adopting *Collins*, 40 F.3d at 100). Under the *Lynch* test, the Hobbs Act only applies if (1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce; (2) the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce; or (3) the number of individuals victimized or the sum at stake is so large that there will be some cumulative effect on interstate commerce. *Id.*

The *Lynch* test, however, is inapplicable in certain cases involving interstate organized crime. *United States v. Rodriguez*, 360 F.3d 949, 955–56 (9th Cir. 2004). To date, seven Circuit Courts and the Ninth Circuit have held that robberies of criminal organizations, even solo drug dealers, constitute

10

robberies of businesses that directly affect interstate commerce. *See United States v. Walker*, 657 F.3d 160, 182 (3d Cir. 2011), cert. denied 132 S. Ct. 1122, (2012); *United States v. Capozzi*, 486 F.3d 711, 726 (1st Cir. 2007); *United States v. Parkes*, 497 F.3d 220, 231 (2d Cir. 2007); *United States v. Ostrander*, 411 F.3d 684, 692 (6th Cir. 2005); *Rodriguez*, 360 F.3d at 955–56; *United States v. Williams*, 342 F.3d 350, 355 (4th Cir.2003); *United States v. Bailey*, 227 F.3d 792, 798–99 (7th Cir. 2000); *United States v. Box*, 50 F.3d 345, 353 (5th Cir. 1995). These cases reason that because criminal organizations, although illegal, are businesses engaged in interstate commerce, robberies of criminal organizations obstruct interstate commerce. *See, e.g.*, *United States v. Thomas*, 159 F.3d 296, 297 (7th Cir. 1998) (Judge Posner) (observing that a robbery that interferes with the sale of drugs "obstruct[s] commerce in a pretty literal sense").

Similarly, the Second and Eleventh Circuits have held that the *Lynch/Collins* test is inapplicable if the victim was chosen because he or she is employed at a company engaged in interstate commerce. *Perrotta*, 313 F.3d at 36; *Diaz*, 248 F.3d at 1089. Under these cases, if an individual is targeted because of his or her affiliation with a company engaged in interstate commerce, then Hobbs-Act jurisdiction exists because the crime's target is interstate commerce, which the Hobbs Act regulates. *Perrotta*, 313 F.3d at 36; *Diaz*, 248 F.3d at 1089. Federal jurisdiction does not exist, however, if the victim merely happens to be employed at a company engaged in interstate commerce when the crime is committed. *Mattson*, 671 F.2d at 1024–25; *Collins*, 40 F.3d at 100.

## II.    The Court's Preliminary Findings of Fact

Having outlined the contours of federal jurisdiction under the Hobbs Act, the court must now examine the validity of the Government's indictment to determine whether it invokes Hobbs-Act jurisdiction. When making this inquiry, Federal Rule of Criminal Procedure 12(b) states that the court must limit its examination to the face of the indictment and take the allegations as true. WRIGHT &

11

LEIPOLD, FEDERAL PRACTICE & PROCEDURE: CRIMINAL 4TH § 194. The court may not invade the province of the jury and decide matters "of the general issue" (*viz*. whether Defendants violated the Hobbs Act). FED. R. CRIM. P. 12(b)(2). The court may, however, make preliminary findings of fact necessary to decide questions of law. *Shortt Accountancy Corp*., 785 F.2d at 1452. To resolve questions of law, like jurisdiction, the court may admit evidence and take judicial notice of facts proffered by the parties. WRIGHT & LEIPOLD, FEDERAL PRACTICE & PROCEDURE: CRIMINAL 4TH § 194. These facts "may not be used against [the defendant] at the trial." *Id*.

### A. The Government's Proffers Vagos's Website as Evidence

One of the salient allegations on the face of the Government's indictment that relates to jurisdiction states that the victim was a "member of the Vagos Motorcycle Club." (Indictment (#1) at 2). Standing alone, this fact does not trigger federal jurisdiction because it is unclear what the Vagos Motorcycle Club is. Accordingly, the court must admit evidence and make a preliminary finding of fact regarding Vagos in order to determine whether the victim's affiliation with Vagos triggers federal jurisdictional under the Hobbs Act and the Commerce Clause.

As discussed above, the parties' motion and papers state that the Vagos Motorcycle Club is a national and international organization that merged with (or subsumed) the victim's Las Vegas chapter of American Cruisers Motorcycle Club. (Def.'s Mot. Dismiss (#60) at 6:16); (Gov't's Opp'n (#74) at 9:4–7, 9:13–15); (Reply (#75) at 2:15). The parties' motions and papers also state that American Cruisers is a national and international organization. (Def.'s Mot. to Dismiss (#60-1) Exhibit A at 1:2); (Gov't's Opp'n (#74) Exhibit 1 at 1:2). To support these claims, the Government proffers, *inter alia*, two exhibits, which are hard copies of Vagos's official website. (*See* Gov't's Opp'n (#74) Exhibits 2–3) (attaching images from OFFICIAL VAGOS MC WORLD SITE, http://vagosmcworld.com/ (last visited Oct. 22, 2013).

The first exhibit is a screenshot of Vagos's website that recalls the history of the club. (*See* Gov't's Opp'n (#74) Exhibit 2 at 1). In pertinent part, the screenshot states that the club originated in San Bernardino, California and that Vagos means "traveling gypsy." (*Id.*) The bottom on the page includes the inscription: "Vagos Motorcycle Club Official International Website." (*Id.*) The second exhibit includes four screenshots of event posters from Vagos's website. (*See* Gov't's Opp'n (#74) Exhibit 3 at 1–4). The posters advertise motorcycle rallies, runs, and events that Vagos and its local chapters sponsored in Canyon Country, California on June 8, 2013, Apple Valley, California on June 2, 2013, Mexico City, Mexico on June 7–9, 2013, and in San Bernardino, California on May 19, 2012. (*Id.*) These screenshots also include an inscription on the bottom of the page that reads: "Vagos Motorcycle Club Official International Website." (*Id.*) The Government proffers these exhibits to demonstrate that Vagos "is an international association" that regularly conducts interstate business. (Gov't's Opp'n (#74) at 9:6–7, 9:13–17) (citing Exhibit 2–3).

### B. *The Admissibility of Websites under the Federal Rules of Evidence*

Federal Rule of Criminal Procedure 12(b) and Federal Rule of Evidence 201 permit the court to take judicial notice of facts contained in websites. WRIGHT & LEIPOLD, FEDERAL PRACTICE & PROCEDURE: CRIMINAL 4TH § 194 (discussing Rule 12(b) and judicial notice of websites); *O'Toole v. Nothrop Grumman*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web"); *accord Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

Under Federal Rule of Evidence 201, the court may take judicial notice on its own; but the court must take judicial notice if a party requests it and the court is supplied with the necessary information. FED. R. EVID. 201(c). Facts that may be judicially noticed are limited to facts "generally known within the trial court's territorial jurisdiction" or facts that "can be accurately and readily determined from

13

sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). When a court takes judicial notice of publications like websites and newspaper articles, the court merely notices what was in the public realm at the time, not whether the contents of those articles were in fact true. *Heliotrope Gen. Inc. v. Ford Motor Co*., 189 F.3d 971, 981 n. 118 (9th Cir. 1999); *accord Premier Growth Fund v. Alliance Capital Mgmt*., 435 F.3d 396, 401 n. 15 (3d Cir. 2006).

Two related concerns, however, generally caution against taking judicial notice of websites. First, as the Seventh Circuit recognized, the internet contains an unlimited supply of information with varying degrees of reliability, permanence, and accessibility. *See Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 648 (7th Cir. 2011). Corporate websites, in particular, are often marketing tools that contain more "puffery" than fact. *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3rd Cir. 2007). Before taking judicial notice of facts contained in websites, the Third and Seventh Circuits advise authenticating printouts of the webpage under Rule 901, supporting the printouts with affidavits, or holding a hearing on the facts to be noticed in order to give the opposing party an opportunity to respond. *Id*.; *Pickett*, 664 F.3d at 648. A frequently cited District Court case from the Western District of Michigan similarly recommends "verify[ing] the information found on . . . websites for accuracy or authenticity." *Dingle v. Bioport*, 270 F.Supp.2d 968, 973 (W.D. Mich. 2003).

Second, the internet is an open source. Anyone may purchase an internet address and create a website. *See, e.g.*, *Reno v. Am Civil Liberties Union*, 521 U.S. 844, 849–853 (1997) (discussing the development of the internet). Federal Rule of Evidence 201(b)(2), however, only permits judicial notice of facts from "sources whose accuracy cannot reasonably be questioned." Accordingly, courts in the Ninth Circuit have taken judicial notice of facts contained in governmental websites. *See, e.g.*, *Daniels–Hall*, 629 F.3d at 998–99. A motorcycle gang's website, by contrast, does not instill a similar level of reliability. *See, e.g.*, *Blanks v. Cate*, No. 11–cv–0171, 2013 WL 322881, at *2 n. 3 (E.D. Cal Jan. 28,

14

2013) (refusing to take judicial notice of a Wikipedia entry); *but see United States v. Espinoza*, No. 11–50350, 2013 WL 2940512, at *3 (9th Cir. June 6, 2013) (stating that the District Court did not err in taking judicial notice of a gang's website).

### B. Analysis

In light of the Third and Seventh Circuits, the court is hesitant to take judicial notice of websites. The court, nonetheless, finds that the concerns raised by the Third and Seventh Circuit are not present here. Five facts support this conclusion.

First, it is not necessary to provide Carr with an evidentiary hearing. As articulated by the Seventh Circuit, the purpose of an evidentiary hearing in this context is to give the opposing party an opportunity to respond. *See Pickett*, 664 F.3d at 648 (citing FED. R. EVID. 201(e) and the advisory committee's note). Carr, however, had an opportunity to respond to the Government's submission in his rely brief. The purpose of a reply brief is to rebut the nonmovant's response. *See, e.g.*, Local Rule 7-2(d); *see also United States v. Campbell*, 279 F.3d 392 (6th Cir. 2002). Rather than rebutting the Government's use of Vagos's website, Carr's reply brief concedes that American Cruisers and Vagos are national or international organizations. (*See* Def.'s Reply (#75) at 2: 13, 15, 19, 21) (making four references to the fact that the clubs are "national").

Second, the fact that the websites are offered to prove—(*i.e.*, that Vagos and American Cruisers are national organizations involved in interstate travel and commerce)—is implicit in the facts that both parties have proffered. The parties are in agreement that: (1) American Cruiser, Vagos, and Confederation of Clubs members pay local membership dues that benefit a national organization, (Gov't's Opp'n (#74) Exhibit 1 at 1:3, 3:18) (*accord* Def.'s Mot. to Dismiss (#60) Exhibit A at 1:3, 3:18); (2) Vagos personnel travel to Hesperia, California to received their patch, (Gov't's Opp'n (#74) at 2:10) (*accord* Def.'s Reply (#75) at 2:17); (3) Vagos purported to control state boarders, (Gov't's Opp'n

(#74) Exhibit 1 at 2:8) (*accord* Def.'s Mot. to Dismiss (#60) at 2:18–19); and (4) the victim, while affiliated with Vagos and American Cruisers, sent bikers from Nevada to Arizona to deal with the Hells Angels, (Gov't Opp'n (#74) Exhibit 1 at 2:16) (*accord* Def.'s Mot. to Dismiss (#60) Exhibit A at 2:16).

Third, although Federal Rule of Evidence 201(b)(2) requires a "source whose accuracy cannot reasonably be questioned," the court again notes that Carr's reply brief does not contest the accuracy of the source. To the contrary, Carr corroborated the veracity and accuracy of the websites. *See, e.g.*, *Pickett*, 664 F.3d at 648; *Dingle*, 270 F.Supp.2d at 973. As discussed in the preceding paragraph, Carr proffered facts that demonstrate that Vagos and American Cruisers are national organizations involved in interstate travel and commerce. (*See, e.g.*, Def.'s Reply (#75) at 2: 13, 15, 19, 21).

Fourth, the statements in the website do not raise any hearsay concerns that would compromise their reliability because the statements are not offered for the truth of the matter asserted. The Government's proffer that Vagos "is an international association," (*see* Gov't's Opp'n (#74) at 9:6–7, 9:13–17) (citing Exhibit 2–3), and that Vagos sponsored events in Apple Valley, California, Canyon Country, California, and Mexico City, Mexico, (*see* Gov't's Opp'n (#74) at Exhibit 3), are not offered to prove that Vagos maintains chapters in Mexico, (*see id.* Exhibit 3 at 3), or that its members actually traveled to Apple Valley, California on June 2, 2013 at 11:00 a.m., (*see id.* Exhibit 3 at 2). Rather, the Government's purpose in proffering the websites is to demonstrate Vagos's effect on interstate commerce.

Accordingly, these statements are admissible under two well-settled exceptions to the hearsay rule. If the event posters were posted on Vagos's website before the events occurred, then the event posters demonstrate Vagos's intent to engage in interstate travel. *Mutual Life Ins. Co. of New York*

*v. Hillmon*, 145 U.S. 285 (1892); FED. R. EVID. 803(3). As such, the statements are admissible because they are not hearsay, *see id*., and they are relevant because they make the fact that Vagos's had a "probable or potential" *de minimis* effect on interstate commerce through organized motorcycle activities more probable. FED. R. EVID. 401.

Alternatively, if the event posters were posted on Vagos's website after the events occurred, then the event posters are verbal acts with an independent legal significance under the Commerce Clause. *See* FED. R. EVID. 801. Vagos's statements that the national office and local chapters engaged in interstate travel concedes jurisdiction under the Commerce Clause because the statements demonstrate that Vagos had a "probable or potential" *de minimis* effect on interstate commerce. *See United States v. Tyler*, 281 F.3d 84, 98 (3rd Cir. 2002) (holding that a statement that the defendant traveled out of state was a verbal act offered to demonstrate federal jurisdiction and not the truth of the matter asserted).

Fifth, under Federal Rule of Evidence 201, the court does not take judicial notice of whether the contents of the websites are actually true. *Heliotrope Gen. Inc.*, 189 F.3d at 981 n. 118 (taking judicial notice "that the market was aware of the information contained in news articles submitted by the defendants"). Rather, the court merely takes judicial notices of what is in the public realm. *Id*. The court does not, therefore, judicially notice that Vagos maintains chapters in Mexico City or that it travelled to Apple Valley, California. Under Rule 201 and the Ninth Circuit's decision in *Heliotrope*, the court merely takes judicial notice of the fact that Vagos held itself out as an organization affecting interstate commerce through organized motorcycle events.

Sixth, any possible prejudicial effect that the website may cause is negated by the court's limited evidentiary findings under Federal Rule of Criminal Procedure 12(b). As discussed above, if the court denies a criminal defendant's Rule 12(b) motion to dismiss, the court's preliminary findings of fact "may not be used against [the defendant] at the trial." WRIGHT & LEIPOLD, FEDERAL PRACTICE &

17

PROCEDURE: CRIMINAL 4TH § 194. Rule 12(b), therefore, nullifies any prejudicial effect that the websites could have on Carr and his co-Defendants because the website is removed from evidence after the court has concluded its jurisdictional inquiry.

The court, therefore, admits the Government's proffered websites for the limited purpose of determining whether the indictment invokes federal jurisdiction under the Hobbs Act.

### III.    The Government's Indictment Invokes Federal Jurisdiction under the Hobbs Act

Having outlined the contours of federal jurisdiction under the Hobbs Act and made preliminary findings of fact, the court now examines the merits of Carr's motion. Carr contends that (1) *Lynch* controls because an individual was victimized, (*see* Def.'s Reply (#75) at 2:8), and (2) the Government's indictment fails to invoke federal jurisdiction because the underlying crime involved the intrastate robbery of the victim's Harley-Davidson, which had no direct or indirect effect on interstate commerce. (*See generally* Def.'s Mot. to Dismiss (#60) at 4–8.)

The court disagrees. First, the *Lynch* test is inapplicable in certain cases involving interstate organized crime, *see Rodriguez*, 360 F.3d at 955–56, and where an individual is targeted because he or she is affiliated with an organization engaged in interstate commerce, *see Perrotta*, 313 F.3d at 36. Second, even if *Lynch* controlled, the Government's indictment satisfies the heightened jurisdictional showing that *Lynch* requires. These points are discussed below.

#### A.    *Lynch is Inapplicable & Rodriguez and Perrotta Control*

The court begins its analysis of Carr's motion by rejecting the suggestion that *Lynch* controls. (Def.'s Reply (#75) at 2:8). Where a defendant is prosecuted under the Hobbs Act for robbing or extorting an individual, the Circuit Courts have charted two paths that lead to a finding of federal jurisdiction on the grounds that the crime—albeit against an individual—targeted a business engaged in

interstate commerce. *See, e.g.*, *Rodriguez*, 360 F.3d at 955–56; *Perrotta*, 313 F.3d at 36. The Government's indictment satisfies both *Rodriguez* and *Perrotta*.

### i.     Hobbs Act Jurisdiction exists under *Rodriguez*

Robbing individuals engaged in interstate organized crime constitutes robberies of businesses that directly affect interstate commerce. *See Rodriguez*, 360 F.3d at 955–56. The line of cases that developed this proposition deal with drugs or drug trafficking. *See, e.g.*, *id.*; *Walker*, 657 F.3d at 181–82; *Parkes*, 497 F.3d at 231; *Ostrander*, 411 F.3d at 692; *Williams*, 342 F.3d at 355; *Capozzi*, 486 F.3d at 726; *Bailey*, 227 F.3d at 798–99; *Box*, 50 F.3d at 353. The Circuit Courts found that robbing narcotics from drug traffickers qualifies as the robbery of a business, which does not require the heightened showing under *Lynch*, because the federalism concerns at the heart of *Lynch* are absent in drug trafficking cases. *Rodriguez*, 360 F.3d at 955–56.

The rationale behind the Circuit Courts' decisions is clear. Eight Circuit Courts, including the Ninth Circuit, drew a distinction between robberies of businesses and robberies of individuals to avoid infringing on the domain of the states. *Id*. In the modern economy, anytime a thief steals an individual's wallet, the crime could be said to affect interstate commerce if use of the victim's ATM card triggers the interstate transfer of funds. *See Lynch*, 282 F.3d at 1053. Predicating federal jurisdiction on such attenuated facts risks converting every robbery into a federal offense and, therefore, violating the Constitution's dual system of government. *Id*.

The Circuit Courts recognized, however, that this concern is absent in drug trafficking cases. Two facts support this conclusion. First, Congress specifically regulates the field of drug trafficking under the Commerce Clause. *Rodriguez*, 360 F.3d at 956 (citing *United States v. Tisor*, 96 F.3d 370, 374 (9th Cir. 1996) (finding that Congress did not exceed its authority under Commerce Clause in adopting Controlled Substances Act)). Second, there is a real and literal obstruction with interstate commerce

when a drug trafficker is robbed of a product that originated out of state. *Walker*, 657 F.3d at 182; *Thomas*, 159 F.3d at 297. Because the Hobbs Act prohibits robberies that obstruct interstate commerce, and because Congress enacted the Controlled Substances Act under the Commerce Clause, the Circuit Courts concluded that there is no federalism concern when the Government prosecutes a robbery involving trafficked drugs under the Hobbs Act.

Like the drug trafficking cases, the Government's indictment avoids federalism concerns. First, Congress specifically regulates the field of carjacking under the Commerce Clause. 18 U.S.C. § 2119; *United States v. Melendez-Rivas*, 566 F.3d 41 (1st Cir. 2009) (stating that 18 U.S.C. § 2119 applies to motorcycles); *see also United States v. Oliver*, 60 F.3d 547, 550 (9th Cir. 1995) (stating that "cars are themselves instrumentalities of commerce, which Congress may protect"). Second, the victim's alleged robbery obstructed interstate commerce in a real and literal sense. It was perpetrated to (1) implement the merger and restructuring of two interstate motorcycle clubs, (2) retaliate against the victim for his refusal to obey Vagos's management and participate in the Vagos's mortgage fraud scheme, and (3) steal the victim's Harley-Davidson, which is an "instrumentality of commerce." *See Oliver*, 60 F.3d at 550.

No federalism concern exists here because Congress enacted the carjacking statute under the Commerce Clause, Defendants allegedly stole an instrumentality of interstate commerce, and the Hobbs Act prohibits robberies that obstruct interstate commerce. Accordingly, following *Rodriguez*, the court concludes that Defendants' alleged robbery victimized a business directly affecting interstate commerce. The indictment, therefore, invokes federal jurisdiction.

### ii. Hobbs Act Jurisdiction exists under *Perrotta* and *Diaz*

The court's conclusion that the victim should be treated as a business directly affecting interstate commerce is bolstered by the Second Circuit's decision in *Perrotta*, 313 F.3d at 36, and the Eleventh

Circuit's decision in *Diaz*, 248 F.3d at 1089. As discussed above, a criminal defendant is not beyond the Hobbs Act's jurisdictional reach simply because the victim is a private individual. In *Perrotta* and *Diaz*, the Second and Eleventh Circuits stated that Hobbs Act jurisdiction exists if the victim was chosen because he or she is employed at a company engaged in interstate commerce. *Perrotta*, 313 F.3d at 36; *Diaz*, 248 F.3d at 1089; *accord United States v. Hodge*, No. 07–CR–0262, 2008 WL 3843824, at *2 (D. Ariz. Aug. 14, 2008).

Although these cases are not controlling, they are instructive. *Perrotta* and *Diaz* recognize that targeting interstate commerce—albeit through an employee—is critical because that is what federal jurisdiction exists to protect. *Perrotta*, 313 F.3d at 36; *Diaz*, 248 F.3d at 1089. If a crime is allegedly committed in order to affect interstate commerce, the defendant cannot escape Hobbs Act prosecution simply because their victim happens to be an employee rather than the corporate entity.

Applying *Perrotta* and *Diaz* to the facts of this case, the court concludes that Hobbs Act jurisdiction exists. Here, the victim was targeted because of his affiliation with American Cruisers and Vagos Motorcycle Club. Both American Cruisers and Vagos are customarily engaged in interstate commerce. *See supra* DISCUSSION § II; *see also* AMERICAN CRUISERS MOTORCYCLE CLUB, http://americancruisers.us/ (last visited Oct. 22, 2013); OFFICIAL VAGOS MC WORLD SITE, http://vagosmcworld.com/ (last visited Oct. 22, 2013) (describing the clubs as national and international organizations). As the president of American Cruisers' Las Vegas chapter and a probationary member of Vagos, the victim was routinely engaged in interstate commerce and controlled the interstate activities of his subordinates. Even after the victim's local chapter of American Cruisers merged with Vagos, the victim sent American-Cruiser members from Las Vegas, Nevada to Arizona to deal with members of the Hells Angels. (Def.'s Mot. to Dismiss (#60) Exhibit A at 2:16).

When the crime was allegedly committed, the victim did not merely happen to be a member of American Cruisers and Vagos. He was targeted in the course of his duties as a member of Vagos, and was allegedly retaliated against because he had been insubordinate by refusing to participate in the organization's mortgage fraud scheme. (*Id*. at 3:7–8, 14). Additionally, Vagos explicitly warned the victim that he would be targeted because of his affiliation with Vagos if he failed to comply with Vagos's directives. (*See* Def.'s Mot. to Dismiss (#60) Exhibit A at 2:15) (stating that Vagos's vice president threatened the victim that if he did not obey he could end up buried in the Glamis, California sand dunes with other insubordinate Vagos members).

The court, therefore, finds that Hobbs Act jurisdiction exists under *Perrotta* and *Diaz* because the alleged robbery was predicated on the victim's status as an American Cruiser chapter president and Vagos probationary member.

### B.    The Government's Indictment Satisfies Lynch's Heightened Jurisdictional Showing

Having determined that Defendants' crime directly affected interstate commerce because Defendants' targeted a business, the court need not examine Carr's argument that the Government lacks jurisdiction under *Lynch*. Nonetheless, because the parties only proffered arguments addressing *Lynch*, the court will now examine whether the Government's indictment satisfies *Lynch's* heightened standard governing Hobbs-Act jurisdiction.

In *Lynch*, the Ninth Circuit adopted the Fifth Circuit's test in *United States v. Collins*. *Lynch*, 282 F.3d at 1053. The test's purpose is to protect the Constitution's distinction between state and federal domains by limiting the reach of the Hobbs Act. *Id.* (quoting *United States v. Morrison*, 529 U.S. 598, 608 (2000) (stating that the commerce power may not "obliterate the distinction between what is national and what is local and create and completely centralized government"). To preserve this distinction, *Lynch* permits Hobbs-Act jurisdiction over crimes against individuals only if: (1) the acts

deplete the assets of an individual who is directly and customarily engaged in interstate commerce; (2) the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce; or (3) the number of individuals victimized or the sum at stake is so large that there will be some cumulative effect on interstate commerce. *Id.*

Carr argues that the Government's indictment does not satisfy any of *Lynch's* three prongs. The court disagrees. With regard to the first prong, federal jurisdiction is appropriate because Defendants' alleged acts depleted the victim's assets (*i.e.*, his motorcycle) and the victim customarily engaged in interstate commerce. As discussed above, the victim's duties involved interstate travel. As a probationary member of Vagos, the victim traveled to Hesperia, California to purchase his "patch." (Def.'s Mot. Dismiss (#60) at 2:23–25); *see also Atcheson*, 94 F.3d at 1243 (stating that the Ninth Circuit has consistently upheld convictions under the Hobbs Act "where the connection to interstate commerce was slight"). The victim also sent members of American Cruisers to Arizona and participated in a meeting where it was announced that members of certain clubs would be prohibited from entering Nevada. These acts trigger federal jurisdiction under the Commerce Clause. *See Huynh*, 60 F.3d at 1389 (stating that the interstate nexus requirement may be satisfied "by proof of a probable or potential impact" on interstate commerce).

In addition to the victim's interstate-travel duties, the victim also participated in interstate-financial transactions. The victim "taxed" nonconforming members of the gangs, paid membership dues to both American Cruisers and Vagos, and traveled to California to participate in a transaction that resulted in the victim receiving a Vagos patch. (Def.'s Mot. Dismiss (#60) at 2:18–19, Exhibit A 2:16). These acts also trigger federal jurisdiction under the Commerce Clause. *See Atcheson*, 94 F.3d at 1243 (stating that the connection to interstate commerce may be slight).

23

With regard to the second prong of the *Lynch* test, federal jurisdiction is appropriate because the Defendants' alleged acts increased the likelihood that the victim would deplete the assets of an entity engaged in interstate commerce. *Lynch*, 282 F.3d at 1053. Sometime after the victim's motorcycle was stolen, the victim defaulted on his loan and was sued by Harley-Davidson, Inc. (Gov't's Opp'n (#74) at 3, 10–11). Carr contends that this fact does not satisfy the second prong of the *Lynch* test because the victim's "account was in 'chronic delinquency.'" (Reply (#75) at 3:18). The *Lynch* test, however, does not demand a "but-for" relationship between the crime and the depletion of assets; rather, it merely requires that the crime "cause or create the ***likelihood***" that the victim would deplete the assets of an entity engaged in interstate commerce. *See Lynch*, 282 F.3d at 1053 (emphasis added).

This requirement is satisfied here. On June 17, 2009, Defendants allegedly robbed the victim of his motorcycle. (Indictment (#1) at 2). Before this time, the victim had already struggled to make payments on Harley-Davidson Inc.'s loan. (*See* Reply (#75) at 3:18); (*see also* Gov't's Opp'n (#74) Exhibit 5 at 1) (identifying the balance on the loan as $26,242.23). After this time, the victim stopped making any payments on Harley-Davidson Inc.'s loan. (*Id*. at 10–11). Defendants, therefore, created the likelihood that the victim would deplete the assets of an entity engaged in interstate commerce.

ACCORDINGLY, and for good cause shown,

IT IS ORDERED that Defendant Steven Carr's motion to dismiss the Government's indictment for lack of jurisdiction (#60) is DENIED.

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Criminal Procedure 12(b), this

///

///

///

order's findings of fact are preliminary findings for jurisdictional purposes that may not be proffered to demonstrate guilty or innocence at trial.

IT IS SO ORDERED.

DATED this 28th day of October, 2013.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE